323 F.2d 333
 Dwight ARMSTRONG, Denise Armstrong, James Armstrong, Jr.,
Floyd Armstrong, Minors, by James Armstrong, Sr.,
their father and next friend, et al., Appellants,
v.
The BOARD OF EDUCATION OF the CITY OF BIRMINGHAM, JEFFERSON
COUNTY, ALABAMA,The Present Members of the Said
Board and Theo R. Wright, Superintendent
ofSchools, City of Birmingham,
Alabama, Appellees.
 No. 20595.
 United States Court of Appeals Fifth Circuit.
 July 12, 1963, Rehearing Denied En Banc July 22, 1963.
Dissenting Opinion July 30, 1963, On Petition for
Intervention and Stay Sept.6, 1963.
 
 W. L. Williams, Jr., Birmingham, Ala., Ernest D. Jackson, Sr., Jacksonville, Fla., Constance Baker Motley, New York City, for appellants.
 Jos. F. Johnston, Reid B. Barnes, Birmingham, Ala., for appellees.
 Before TUTTLE, Chief Judge, and RIVES and GEWIN, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 The submission is upon the appellants' motion for an injunction pending appeal from the following judgment entered on the 28th day of May 1963:
 
 
 2
 'In conformity with the memorandum opinion of the court contemporaneously entered herein, it is ORDERED, ADJUDGED and DECREED by the court that the injunctive relief for which plaintiffs pray in their own behalf and in bahalf of others similarly situated by and the same is hereby denied.
 
 
 3
 'It is further ORDERED, ADJUDGED and DECREED by the court that jurisdiction of this action is hereby retained for the purpose of permitting the filing of such supplemental complaint, if any, as might be entitled to be presented, in case of any unconstitutional application of the Alabama School Placement Law against the plaintiffs, or others similarly situated, or of any other unconstitutional action on the part of defendants against them. It is further ORDERED, ADJUDGED and DECREED by the court that the issues tendered by any supplemental complaint will be given a preferred setting on the docket of this court and will be heard on five days' notice to defendants.'
 
 The opinion of the court stated that:
 
 4
 'This court will not sanction discrimination by them (the Superintendent and Board of Education) in the name of the placement law but it is unwilling to grant injunctive relief until their good faith has been tested. If it should be demonstrated that it has been unconstitutionally applied, under the settled authorities the court would be compelled to order the submission of a desergregation plan for its approval.'
 
 
 5
 The district court affirmed that both the Superintendent and the Board had assured the court that regulations governing the assignment and transfer of pupils in the Birmingham school system had been in effect since June 1958 for the purpose of implementing the Alabama law; and found that sufficient time remained before the opening of school in September 1963 for the processing of applications for assignments and transfers in bahalf of interested individuals.
 
 
 6
 The opinion further stated that after application for assignment or transfer was made by a pupil, or those authorized to act in his behalf, to the school baord, judicial remedies for the denial of constitutional rights could be pursued at once in the United States District Court without pursuing state court remedies.
 
 The opinion continued:
 
 7
 'Jurisdiction of this action will be retained for the purpose of permitting the filing of such supplemental complaint, if any, as might be entitled to be presented, in case of any unconstitutional application of the Alabama School Placement Law against the plaintiffs, or others similarly situated, or of any other unconstitutional action on the part of defendants against them. The issues tendered by any supplemental complaint will be given a preferred setting on the docket of this court and will be heard on five days notice to defendants.'
 
 
 8
 The district court further mentioned the fact the the Superintendent and the Board had assured the court that '* * * they stand ready to comply with the law when any individual sets the administrative machinery in motion.' By affidavit of the Superintendent speaking on behalf of the Board filed in this Court, it is stated:
 
 
 9
 'It (the Board) was and is now prepared to deal with the matter in a proper and orderly manner upon applications pursuant to the laws of Alabama and the decree of the District Court in this case.'
 
 
 10
 In the course of its opinion the district court stated: 'Before this court may grant injunctive relief, the administrative remedies provided therein (in the Alabama School Placement Law) must first have been exhausted.'
 
 
 11
 That ruling was directly contrary to repeated decisions of this Court. See, among others, Gibson v. Board of Public Instruction of Dade County, 5 Cir. 1957, 246 F.2d 913, 914;[1] on second appeal, 5 Cir. 1959,272 F.2d 763, 767;[2] Holland v. Board of Public Instruction of Palm Beach County, Fla., 5 Cir. 1958, 258 F.2d 730, 732.[3] Mannings v. Board of Public Instruction, 5 Cir. 1960, 277 F.2d 370, 372, 373; Augustus v. Board of Public Insturction, 5 Cir. 1962, 306 F.2d 862, 869; Bush v. Orleans Parish School Board, 5 Cir. 1962, 308 F.2d 491, 499-501.[4] The district court chose, instead, to rely upon a line of decisions from the Fourth Circuit,[5] which, according to the district court, 'continued to apply the doctrine of exhaustion of administrative remedies fairly and lawfully conducted.' In Gibson v. Board of Public Instruction, supra, 272 F.2d 763, 767, n. 5, we noted many of the same Fourth Circuit decisions and stated our understanding that they were not contrary to the decisions of this Fifth Circuit. In any event, on June 3, 1963, shortly after the district court's decision, the Supreme Court of the United States put beyond debate the proposition that, in a school desegregation case, it is not necessary to exhaust state administrative remedies before seeking relief in the federal courts:
 
 
 12
 'We have previously indicated that relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided a remedy. We stated in Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492:
 
 
 13
 'It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'
 
 
 14
 'The cause of action alleged here is pleaded in terms of 42 U.S.C. 1983 * * *.
 
 
 15
 'That is the statute that was involved in Monroe v. Pape, supra; and we reviewed its history at length in that case. 365 U.S. 171 et seq., 81 S.Ct. 473, 5 L.Ed.2d 492. The purposes were several fold-- to override certain kinds of state laws, to provide a remedy where state law was inadequate, 'to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice' (id., 174, 81 S.Ct. 477), and to provide a remedy in the federal courts supplementary to any remedy any State might have. Id., 180-183, 81 S.Ct. 480-482.
 
 
 16
 '* * * The right alleged is as plainly federal in origin and nature as those vindicated in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Nor is the federal right in any way entangled in a skein of state law that must be untangled before the federal case can proceed. For petitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether respondents' conduct is legal or illegal as a mater of state law. Monroe v. Pape, supra, 365 U.S. 171-187, 81 S.Ct. 475-484. Such claims are entitled to be adjudicated in the federal courts. Monroe v. Pape, supra, 365 U.S. at 183, 81 S.Ct. at 481; Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, affirming 142 F.Supp. 707; Borders v. Rippy, 5 Cir., 247 F.2d 268, 271. Cf., e.g., Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Schnell v. Davis, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 affirming 81 F.Supp. 872; Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762.'
 
 
 17
 McNeese v. Board of Education for Community Unit School District 187, 83 S.Ct. 1433.[6]
 
 
 18
 The district court's opinion referred to the reluctance of any Negro child 'to take the initiative in bringing about the integration of the public schools.' The burden of initiating desegregation does not rest on Negro children or parents or on whites, but on the School Board. As said in Brown v. Board of Education, 1955, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083:
 
 
 19
 'Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.'
 
 
 20
 The long-standing order of responsibility is 'first the school authorities, then the local district court, and lastly the appellate courts.' Rippy v. Borders, 5 Cir. 1957, 250 F.2d 690, 693.
 
 
 21
 Further, as we said recently in speaking of the Atlanta public schools:
 
 
 22
 'Our decision must also be rendered upon a consideration of the most recent pronouncements of the Supreme Court, Goss v. Board of Education of City of Knoxville, Tenn., supra (83 S.Ct. 1405), and Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529, which make it plain that the time available for the transition from segregated to desegregated school systems is, with the passage of years since the Brown decisions, becoming more sharply limited. Indeed, we so stated in an opinion theretofore rendered on May 24, 1963. Davis v. Board of School Commissioners of Mobile County, 5 Cir., 318 F.2d 63.'
 
 
 23
 Calhoun v. Latimer, 5 Cir., 321 F.2d 302.
 
 
 24
 In the light of the foregoing well-established principles of law, we go to the undisputed facts as found by the district court:
 
 
 25
 'The white population of Birmingham is 205,620; the negro, 135,627. There are 8 high schools designated 'White' with 409 teachers and 10,081 pupils; 5 high schools designated 'Negro' with 278 teachers and 6,748 pupils; 50 elementary schools designated 'White' with 781 teachers and 29,578 pupils; 42 elementary schools designated 'Negro' with 697 teachers and 26,967 pupils. Never at any time has a negro pupil been assigned or transferred to a school designated 'White' or a white pupil to a school designated 'Negro.' Without exception white instructional personnel have been assigned only to schools designated 'White' and negro instructional personnel only to schools designated 'Negro.' White schools are located with reference to the concentration of white population and negro schools with reference to the concentration of negro population. There are overlappings in the geographical areas involved wherein there are white schools in closer proximity to the residences of negro pupils than negro schools. The reverse situation obtains with respect to white pupils. Notwithstanding, the custom, usage and practice historically followed, sanctioned and expected by Superintendent and Board to be followed presently, result in white pupils attending white schools and negro pupils negro schools.
 
 
 26
 'To summarize, it graphically appears from the testimony of Dr. Theo R. Wright, Superintendent of Birmingham Public Schools, that he and the Birmingham Board of Education have operated a segregated school system based upon race in the past, are doing so now, and have formulated no plans to discontinue such an operation.'
 
 
 27
 This litigation has now been pending for more than three years. There must, at the very minimum, be a good faith start toward according the plaintiffs and the members of the class represented by them their constitutional rights so long delayed. However, whether the delay which has already occurred is justified or not, it cannot be compensated by hasty or precipitate action under the order of this Court. Our action must be dictated by the concept of 'deliberate speed' to the extent of not causing undue or unnecessary confusion in the administration of the Birmingham public schools to the injury of all of the pupils, white and black. In the case of the Pensacola, Florida, School System, we said on July 24, 1962, about a year ago: 'It is probably too late, without undue confusion, to require the elimination as to any grade of such dual districts in time for the 1962 fall term.' Augustus v. Board of Public Instruction, 5 Cir. 1962, 306 F.2d 862, 869. This same thought now holds true as to the Birmingham public schools.[7]
 
 
 28
 We decline, therefore, to issue an injunction pending appeal which would go so far as to provide that the maintenance of separate schools for the Negro and white children of Birmingham shall be completely ended with respect to any grade, or when and how the complete desegregation of the public schools may be accomplished. Such matters can be more appropriately determined upon a hearing of this appeal on its merits when a full record will be available. It affirmatively appears at this time, however, on the face of the opinion and judgment of the district court, that the plaintiffs and the members of the class represented by them are entitled to more than mere expressions of opinion and have a right to a judgment legally enforcing the desegregation measures on which the Board has virtually agreed.
 
 
 29
 In line with the procedure which we followed as to the Savannah, Georgia, schools in Stell, et al. v. Savannah-Chatham County Board of Education, et al., 5 Cir., No. 20557, 318 F.2d 425, it is therefore ORDERED that the District Court for the Northern District of Alabama enter the following judgment and order:
 
 
 30
 'The defendants, The Board of Education of the City of Birmingham, Jefferson County, Alabama, the present members of said Board (naming them specifically) and Theo R. Wright, Superintendent of Schools, City of Birmingham, and their agents, servants, employees, successors in office and those in concert with them who shall receive notice of this order, be and they are hereby restrained and enjoined from requiring segregation of the races in any school under their supervision, from and after such time as may be necessary to make arrangements for admission of children to such schools on a racially nondiscriminatory basis with all deliberate speed, as required by the Supreme Court in Brown v. Board of Education of Topeka, 349 U.S. 294 (75 S.Ct. 753, 99 L.Ed. 1083).
 
 
 31
 'It is further ordered, adjudged and decreed that said persons be and they are hereby required to submit to this Court not later than August 19, 1963, a plan under which the said defendants propose to make an immediate start in the desegregation of the schools of Birmingham, Jefferson County, Alabama, which plan shall effectively provide for the carrying into effect not later than the beginning of the school year commencing September 1963 and thereafter of the Alabama Pupil Placement Law as to all school grades without racial discrimination, including 'the admission of new pupils entering the first grade, or coming into the County for the first time, on a nonracial basis,' Augustus v. Board of Public Instruction, 5 Cir. 1962, 306 F.2d 862, 869 (that opinion describes such a plan which has been approved and is operating in Pensacola, Florida).'
 
 
 32
 Nothing contained in this opinion or in the order directed to be issued by the district court is intended to mean that voluntary segregation is unlawful; or that the same is not legally permissible.
 
 
 33
 This order shall remain in effect until the final determination of the appeal of the above-styled case in the Court of Appeals for the Fifth Circuit on the merits, and until the further order of this Court. During the pendency of this order the district court is further directed to enter such other and further orders as may be appropriate or necessary in carrying out the expressed terms of this order.
 
 
 34
 In view of the already long delay, it is ordered that the mandate issue forthwith.
 
 
 35
 Motion granted.
 
 
 36
 TUTTLE, Chief Judge (concurring specially).
 
 
 37
 I, of course, join Judge Rives in the action taken on the appellants' motion for injunction pending appeal, and I join him in the order that is embodied in his opinion. I agree wholeheartedly with all that is said in his opinion, except as it bears on the relief that is to be granted in September, 1963.
 
 
 38
 It is now, as it has been from the start, the duty of the Board of Education to assume the primary responsibility putting an end to racially segregated schools. Brown v. Board of Education of Topeka (1955) 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083. In a situation where such a board of education has completely failed to make such a start, and, fortuitously or otherwise, the first appealable order entered by a district court comes so late in the school year that the Board then attempts to say it is too late to do anything by the following school year, I think it is the duty of an appellate court to require a maximum effort by the Board to do what the law clearly requires of it, rather than to accept as a substitute for performance a plea that the Board has not made necessary preparation to permit orderly transition by the opening of the fall term of school.
 
 
 39
 I believe it would not be consistent with what this Court has previously required in other situations if I did not express the view, strongly held by me, that as a minimum the Board of Education of the City of Birmingham should be required by an injunction of the trial court to arrange that at least one grade of the public schools of that city be completely desegregated by the abolition of dual school zones pending the appeal of this case on the merits in this Court. See Stell v. Savannah-Chatham County Board of Education, et al., 5th Cir. No. 20557, 318 F.2d 425 and see Davis et al. v. Board of school Commissioners of Mobile County et al., 5th Cir., 322 F.2d 356. Since, however, a majority of the court does not require this relief, I join in the order as written by my esteemed colleague, Judge Rives.
 
 
 40
 GEWIN, Circuit Judge (dissenting).
 
 
 41
 My brothers of the majority have spoken in such inaccurate and disapproving terms with reference to the opinion and order of the distinguished trial judge of the Northern District of Alabama who tried this case for several days, that I find it not only impossible to agree with them, but also necessary to write this dissent in order to inform those who may be interested of my opinion of the actual holding of the District Court. The cases cited by the majority condemn the opinion written by them. The opinion and order of the District Court considered together as they should be, destroy every reason asserted in the majority opinion for the unusual action taken in the circumstances of this case by the issuance of an injunction pending appeal in the merits.
 
 
 42
 It should be noted quickly that the majority opinion leaves little to be decided when the case reaches this court on the merits. Under the guise of 'injunction pending appeal' that opinion substantially decides the case and renders moot many questions which could arise when the case reaches the court for final decision after a review of the record. It is recognized that injunctions pending appeal may be used in exceptional and extreme cases where there is a clear abuse of discretion or usurpation of judicial power. Such extreme, harsh and unusual action should never be taken as a substitute for a proper decision on the merits. The action in this case is taken without any pretense that the court has taken so much as a hurried glance at the record. There has not been sufficient time for the record to reach the court. In effect my brothers of the majority have concluded that this is an extreme and exceptional case, involving either an abuse of discretion or usurpation of judicial power. Accordingly, they have ordered the District Court to issue a 'judgment and order' enjoining the Superintendent and Board of Education of Birmingham, and have directed '* * * that the mandate issue forthwith.' This drastic action has been taken within a few days following the submission of the case on the motion for injunction-- not on the merits. As late as June 3, 1963, the Supreme Court stated in Goss v. The Board of Education of the City of Knoxville, Tenn., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, a school segregation case, a recognition of:
 
 
 43
 '* * * the multifarious local difficulties and 'variety of obstacles' which might arise in this transition * * *.'
 
 
 44
 and the court further stated:
 
 
 45
 'In reaching this result we are not unmindful of the deep-rooted problems involved.'
 
 
 46
 In the instant case, this court has not even had the opportunity to review the evidence which was before the trial judge for the purpose of considering any 'variety of obstacles' or 'deep-rooted problems' which may be involved. This court does not have sufficient facts before it, in the absence of the record, to render a decision 'guided by equitable principles' and 'characterized by a practical flexibility in shaping its remedies' and to exercies the requisite facility 'for adjusting and reconciling public and private needs.'[1]
 
 
 47
 I. THE OPINION AND ORDER OF THE DISTRICT COURT
 
 
 48
 The majority opinion quotes certain excerpts from the opinion of the court below, but the excerpts quoted do not fairly represent the opinion of that court. The action of the District Court in its memorandum opinion and order may be summarized in outline form as follows:
 
 
 49
 (a) The District Court stated that the 'starting point in any school segregation case must be Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the implementing decree of the court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). and its reinterpretative opinion, Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958)', and recognized that it was bound by the holdings in the cases cited.
 
 
 50
 (b) Proper notice was taken of the fact that '* * * district courts have been invested with the are expected honestly and fairly to exercise discretion in the enormous task of desegregating public schools.' The opinion asserts that the course to be followed in the discharge of such task was 'staked out' in an opinion written by Judge Rives in the case of Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372 (N.D.Ala.1958) aff'd. by Supreme Court 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145, wherein it is unequivocally held:
 
 
 51
 'All that has been said in this present opinion must be limited to the constitutionality of the law upon its face. The School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils under a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the State.'
 
 
 52
 (c) Expressly stating that the law of this case is that the Alabama School Placement Law '* * * furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color,' the court held that the pupil, or those authorized to act in the pupil's behalf, should first apply for assignment or transfer; and that before the court would grant injunctive relief, the administrative remedies provided by the Alabama act as modified and limited by the Court's opinion and order must first be used.
 
 
 53
 (d) The opinion clearly holds that after application for assignment or transfer is made by a pupil, or those authorized to act in his behalf, to the school board, judicial remedies for the denial of Constitutional rights can then be pursued at once in the United States District Court without pursuing state court remedies. The court observed the fact that this Court of Appeals has been alert to strike down deviations by district courts from the Constitutional principles laid down in the Brown case, and asserted that the court had carefully read and considered all of the decisions by this Court of Appeals relative to the subject.
 
 
 54
 (e) The District Court correctly concluded that this Court of Appeals[2] has not heretofore had cause to consider whether the Alabama law has a permissible scope of operation in the desegregation of public schools, but it was noted that the Fourth Circuit had dealt with a similar state act in the case of Carson v. Warlick, 238 F.2d 724 (4 Cir. 1956), which was cited with approval in the Shuttlesworth case.
 
 
 55
 (f) The opinion and order squarely state that discrimination will not be tolerated, and uses the following language in so holding:
 
 
 56
 'This court will not sanction discrimination by them (the Superintendent and Board of Education) in the name of the placement law but it is unwilling to grant injunctive relief until their good faith has been tested. If it should be demonstrated that it has been unconstitutionally applied, under the settled authorities the court would be compelled to order the submission of a desegregation plan for its approval.'
 
 
 57
 The District Court affirmed that both the Superintendent and the Board had assured the Court that regulations governing the assignment and transfer of pupils in the Birmingham school system had been in effect since June 1958 for the purpose of implementing the Alabama law; and found that sufficient time remained before the opening of school in September 1963 for the processing of applications for assignments and transfers in behalf of interested individuals.
 
 
 58
 (g) Jurisdiction of the action was retained for the purpose of hearing any complaint which might be presented '* * * in case of any unconstitutional application of the Alabama School Placement Law against the plaintiffs, or others similarly situated, or of any other unconstitutional action on the part of defendants against them.' The trial court mentioned the fact that the Superintendent and the Board had assured the court that '* * * they stand ready to comply with the law when any individual sets the administrative machinery in motion.' By affidavit of the Superintendent speaking on behalf of the Board filed in this court, it is stated:
 
 
 59
 'It (the Board) was and is now prepared to deal with the matter in a proper and orderly manner upon applications pursuant to the laws of Alabama and the decree of the District Court in this case.'
 
 
 60
 (h) In case any complaint is made by any person, the issues tendered thereby are to be given '* * * a preferred setting on the docket of this court and will be heard on five days notice to defendants.'
 
 
 61
 It is my considered opinion that the action of the District Court fully complies with both Brown decisions, the decision in the Aaron case, and is in complete accord with the previous holdings of this court. The trial court found as a fact that according to the uncontroverted record before the court, that no Negro child, or anyone authorized to act in his behalf, had applied for enrollment in or transfer to any school designated White, and pursued the remedies afforded by the Alabama statute. It was further found as a fact that such reluctance to bring about integration of the public schools was not a 'blind adherence to tradition', but that the undisputed evidence in the record (which this court has not yet seen) clearly shows that there is 'very strong opposition to the mixing of the races in the schools of Birmingham on the part of citizens of all races.' The District Court rejected forthwith the opinions of experts in the fields of psychology any anthropology in whatever form insofar as they constitute an attack upon the rules of law laid down by the Supreme Court in the Brown and Aaron decisions.
 
 
 62
 A casual analysis of the opinion and judgment of the District Court should convince anyone that the court has not followed the Alabama act blindly, but has used it only insofar as it 'furnishes the legal machinery' for the desegregation of the schools in a Constitutional manner. The assignment and transfer of students from school to school, and the right to make objection to an assignment already made were covered by the opinion. In their brief, the Superintendent and Board admit and affirmatively assert that the provisions of the Alabama act and the decree of the court 'are not restricted in application to any grade or grades * * *'; that it '* * * authorizes application for initial assignment to any school by the entering first grade students'; and that there is '* * * no limitation on the number of pupils who may apply for assignment or transfer.' In my opinion, the plan outlined by the District Court not only meets the standards recently expressed by this court in the case of Calhoun v. Latimer, 5 Cir., 321 F.2d 302, but makes more liberal provisions with respect to assignment, transfer and objection to assignment, previously made, because such provisions are applicable to all grades in Birmingham.
 
 
 63
 A fair and proper analysis of the ruling of the District Court will reveal that it is not subject to the criticism that students cannot make application for assignment to a school of their choice on entering the first grade as denounced in Bush v. Orleans Parish School Board, 308 F.2d 491, 5 Cir. 1962. Such applicants for assignment or transfer are not impeded by dual school districts as was involved in Augustus v. Board of Pub. Inst. of Escambia Co., 306 F.2d 862, 5 Cir., 1962; the plaintiffs are not required to comply with the details of the Alabama Placement Law as condemned in Mannings v. Board of Pub. Inst. of Hillsborough Co., Fla., 277 F.2d 370, 5 Cir. 1960; nor is there a failure to afford a reasonable and conscious opportunity to pupils to apply for admission to any school to which they are eligible as condemned in Gibson v. Board of Pub. Inst. of Dade Co., Fla., 272 F.2d 763, 5 Cir. 1958. It is true that the Brown decision places first responsibility to desegregate on the school authorities; but if the school authorities do not act, the district courts are required to act. Admittedly, the school authorities in Birmingham have not submitted a plan of desegregation. Their failure resulted in this lawsuit, and the District Court has now directed the authorties to proceed with desegregation as provided by the Alabama law and the decree of the District Court. By retaining jurisdiction of the case and ordering that any complaint will be heard on five days' notice, the District Court has provided an effective and speedy method of supervision. We know of no plan or other remedy which is calculated to give better relief. The failure of the school authorities to act does not require injunctive relief in cases where a method of desegregation is outlined and provided as was done in this case. Plans presented by school boards are rarely ever approved in toto. Even after plans are submitted by school authorities and revised by the courts, litigation seems to continue.
 
 II. THE MAJORITY OPINION
 
 64
 (a) Injunction Pending Appeal:
 
 
 65
 There is an ancient and classic principle long recognized by all courts with reference to the granting of injunctions whether at the trial or appellate level, forcefully stated by Justice Baldwin, sitting at Circuit in the year 1830, in the case of Bonaparte v. Camden, 8 A.R. Co. (C.C.N.J.1830) Fed.Cas.No.1,617, p. 821:
 
 
 66
 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction; * * *.'
 
 
 67
 Rule 62 F.R.Civ.P. deals with the question of injunction pending appeal. Subsection (c) of that rule relates to the power of district courts to issue such injunctions pending appeal. Subsection (g) of the same rule deals with the subject on the appellate level. It is conceded that a District Court (to which the Federal Rules of Civil Procedure generally apply) may grant injunctive relief pending an appeal as provided by subsection (c). Such is the holding of the Ninth Circuit in United States v. El-O-Pathic Pharmacy, 9 Cir. 1951, 192 F.2d 62. In construing the rule and commenting on the last cited case, one of the leading commentaries on federal practice and procedure states the rule to be as follows:
 
 
 68
 'In that case the court also pointed out that appellate courts are not as well equipped as the trial court to enforce an order of the sort in question. Thus Rule 62(g), allowing the appellate court to make such orders, should be regarded as supplementary to Rule 62(c). In the normal case parties should be required to seek relief first from the trial court, with the appellate court acting only if the trial court has erroneously refused to grant such relief.'
 
 
 69
 Vol. 3 Fed.Practice & Procedure, Rules Ed. (Rev. by Wright) 1373, p. 466
 
 
 70
 It should be emphasized and made crystal clear that there is no showing before us that the appellants in this case sought interlocutory relief in the trial court.[3]
 
 
 71
 My brothers of the majority have directed the issuance of a mandatory injunction, which, of necessity, is of an interlocutory nature, because this case has not been reached on its merits. A clear statement of the law is contained in W. A. Mack, Inc. v. General Motors Corp., 7 Cir. 1958, 260 F.2d 886 as follows:
 
 
 72
 '* * * mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds.'
 
 
 73
 See also Miami Beach Federal Savings & Loan Ass'n v. Callander, 5 Cir. 1958, 256 F.2d 410. The usual case arises upon an appeal from an order of the trial court granting or denying a preliminary injunction and even in such cases, the scope of review is limited. In re Tucker Corp. (Veenkant v. Yorke), 7 Cir. 1958, 256 F.2d 808; Mytinger & Casselberry, Inc. v. Numanna Labs. Corp., 7 Cir. 1954, 215 F.2d 382; O'Malley, et al. v. Chrysler Corp., 7 Cir. 1947, 160 F.2d 35; Vol. 3 Fed.Practice & Procedure, Rules Ed. (Rev. by Wright) 1373.
 
 
 74
 In directing the District Court to issue a mandatory injunction pending determination of the appeal in this case on the merits, the majority claims that it is acting 'in line with the procedure which we followed * * *.' In Stell et al. v. Savannah-Chatham Co. Board of Education et al., 5 Cir., 318 F.2d 425, May 24, 1963. In making such an assertion, the majority is clearly in error because it has overlooked the fact that the appeal in Stell was interlocutory as provided by 28 U.S.C.A. 1292(1), from a judgment of the District Court denying a motion for preliminary injunction. The relief granted in Stell purports to have been granted under the All Writs Act, 28 U.S.C.A. 1651(a). That opinion recognizes that the All Writs Act was intended to be used only in the exceptional case where there had been an abuse of discretion or usurpation of judicial power, and should be used only in 'extreme cases'. The authorities there cited, Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106; and LaBuy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290, do not support the action of the majority in this case.
 
 
 75
 All 3 cases, Stell, Bankers Life, and LaBuy, involve interlocutory appeals relating to the denial or granting of interlocutory relief. It was never intended that the All Writs Act should be used as a substitute for appeals, and this is true even though hardship may result from delay. In any event, a heavy burden is placed upon those who petition for the writ to show that their right to its issuance is 'clear and undisputable'. Although the writ sought in Bankers Life was a writ of mandamus, the court was speaking of the All Writs Act, 28 U.S.C.A. 1651(a) when it there observed:
 
 
 76
 '* * * Congress must have realized that in the course of judicial decision some interlocutory orders might be erroneous.'The court assumed the existence of the difficulties of which petitioner there complained, resulting in the creation of many legal and practical problems, but the court observed:
 
 
 77
 '* * * but Congress must have contemplated those conditions in providing that only final judgments are reviewable.'
 
 The Court concluded:
 
 78
 'But it is established that the extraordinary writs cannot be used as substitutes for appeals, Ex parte Fahey, 332 U.S. 258, 259-260, (67 S.Ct. 1558, 91 L.Ed. 2041-2043) (1947), even though hardship may result from delay and perhaps unnecessary trial, United States Alkali Export Assn. v. United States, 325 U.S. 196, 202-203, (65 S.Ct. 1120, 89 L.Ed. 1554, 1560, 1561) (1945); Roche v. Evaporated Milk Assn., supra (319 U.S. 21), at 31 (63 S.Ct. 938, 87 L.Ed. 1185); and whatever may be done without the writ may not be done with it. Ex parte Rowland, 104 U.S. 604, 617 (26 L.Ed. 861, 866) (1882). "[4] (emphasis added)
 
 
 79
 Traditionally, injunctions pending appeal have been issued in cases of extreme emergency, to avoid mootness, to preserve the status quo, to protect the jurisdiction of the court; and in the leading cases on the subject, if not all, injunctive relief pending appeal is granted only after the trial court has refused to grant interlocutory relief. Such a request was made in the Stell case. No such action was requested of the trial court in the instant case. Not only is it unfair and inconsiderate for an appellate court to grant such relief pending appeal when the trial court has had no opportunity to pass upon the question, such relief should never be granted as a substitute for an appeal. In passing upon injunctive relief, the court should take no action which will preclude fair consideration on the merits. As stated in Mesabi Iron Co. v. Reserve Mining Co., 8 Cir. 1959, 270 F.2d 567:
 
 
 80
 '* * * the appellate court ought not to determine crucial questions conditioning the merits of the case * * *.'
 
 
 81
 If this is the law in cases where interlocutory relief is first sought in the trial court, such a rule should be more strictly followed in cases where no interlocutory relief was sought in the lower court. Prior to the instant case, such has been our holding. As stated in Miami Beach Federal Savings & Loan Ass'n, supra:
 
 
 82
 'We have repeatedly held that an order for a temporary injunction does not and cannot decide the merits of the case.'
 
 
 83
 This court has recently spoken concerning the extraordinary remedy of injunction pending appeal in Greene v. Fair, Feb. 18, 1963, 314 F.2d 200, and there clearly stated the controlling principles:
 
 
 84
 'The reason for the sparing use of this power is apparent. Litigants are given the opportunity to try their cases in a district court and they are given an unlimited right of appeal to the Courts of Appeal. The rules of this Court make possible a prompt hearing of all regularly docketed appellate cases. The rules provide for accelerated hearings in cases in which cause therefor is shown. The vindication of private rights by litigation necessarily entails some delay. Laymen and courts alike regret any delay in the vindication of a right that is not the natural and proper result from the orderly handling of the litigation. Historically and traditionally within our system of justice, appellate procedure calls for the docketing of a case, the furnishing of the transcript of the record to the appellate judges, a full briefing by the appellant, with an opportunity for response to be made by the appellee, and oral argument after consideration of the records and briefs by the Court. The time required to prosecute an appeal in this manner is recognized by all to be time well spent in the ordinary case.'
 
 
 85
 (b) The Ruling and Mandate of the Majority:
 
 
 86
 The majority opinion asserts that nothing contained therein is to be construed as enjoining or restricting voluntary segregation. This Court is unequivocally committed to the proposition that voluntary segregation is permissible. The order and opinion before us for review do not require segregation, but most emphatically state that any action on the part of the Superintendent and Board requiring segregation will not be tolerated. Accordingly, it is difficult for me to see any useful purpose in issuing the extraordinary writ of injunction pending appeal. As a matter of fact, in the case of Rippy v. Borders, 5 Cir. 1957, 250 F.2d 690, this Court specifically held that a district court should not issue an order enjoining the school board from 'permitting' segregation. Briggs v. Elliott, E.D.S.C.1955 (three-judge court composed of Parker and Dobie, Circuit Judges, and Timmerman, District Judge), 132 F.Supp. 776; Avery v. Wichita Falls Independent School Dist., 5 Cir. 1957 (Judge Rives), 241 F.2d 230; Borders v. Rippy, 5 Cir. 1957 (Judge Rives), 247 F.2d 268; Boson v. Rippy, 5 Cir. 1960 (Judge Rives), 285 F.2d 43.
 
 
 87
 As a matter of fact, the opinion and order clearly state that the District Court '* * * will not sanction discrimination * * *,' and the doors of the court are held open to hear any complaint of '* * * any unconstitutional application of the Alabama School Placement Law against the plaintiffs, or others similarly situated, or any other unconstitutional action on the part of the defendants against them.'
 
 
 88
 The cases in the majority opinion, particularly Gibson (2 appeals), Holland, Mannings, Augustus, and Bush, all denounce 'the requirement of racial segregation in the public schools.' In the first Gibson appeal, in speaking of the Florida law, it was stated, '* * * neither that nor any other law can justify a violation of the Constitution of the United States by the requirement of racial segregation in the public schools.' To the same effect was the second Gibson appeal.[5] The opinion and order now before us for review do not require segregation, but provide a means of orderly desegregation.
 
 
 89
 The most recent decisions bearing on the issues before us are two cases from our own court, the Stell case, and Calhoun v. Latimer, 5 Cir., 321 F.2d 302; and two Supreme Court cases, both decided on June 3, 1963, McNeese v. Board of Education, involving an Illinois statute, and Goss v. Board of Education of Knoxville, Tenn., 83 S.Ct. 1405. In addition to the distinguishing features in the Stell case which we have heretofore mentioned, a reading of that opinion will show that admission and attendance at schools in Savannah-Chatham County, Georgia, was required on a racial basis. The opinion further stated that evidence was admitted and considered which '* * * tended to support the thesis that compliance with the Supreme Court's decision (Brown v. Board of Education) would be detrimental to the Negro plaintiffs and the white students in the Savannah-Chatham County school system.' The so-called Altanta Plan approved in the Latimer case supports the decree of the District Court here involved. as a matter of fact, the decree of the District Court authorizes a procedure for desegregation as to all 12 grades, which the Atlanta Plan does not. This is not a criticism of the Atlants Plan. The Supreme Court and the decision in Latimer, as well as numerous other cases, recognize the well known fact that all cases are not alike.
 
 
 90
 In the McNeese case, the court was considering an administrative remedy provided by the Illinois school code. First, the court decided not to apply the rule announced in Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 relating to abstinence by a federal court in cases where state administrative remedies are made available. As to that question, the court found, 'We have, however, in the present case no underlying issue of state law controlling this litigation.' The court reasoned that '* * * it is by no means clear that Illinois law provides petitioners with an administrative remedy sufficiently adequate to preclude prior resort to a federal court for the protection of their federal rights.' The court concluded that the Illinois law was no remedy at all.[6] McNeese asserts that 'it would be anomalous to conclude that such a remedy forecloses suit in the federal courts when the most it could produce is a state court action that would have no such effect.' The opinion rendered by the District Court in the instant case does not authorize or tolerate the procedure criticized in the McNeese case. Footnote 2 of the District Court's opinion provides, 'After administrative remedies before the school board have been exhausted, judicial remedies for denial of constitutional rights may be pursued at once in this court without pursuing state court remedies.' The McNeese case did not hold or intimate that it was unlawful for a district court to require limited administrative procedure such as that required by the holding of the trial court in this case. Regardless of what we say, school systems must be operated by school superintendents and school boards, or by some administrative agency. All administrative procedure is not unlawful. Indeed, schools cannot operate without administrative procedure. As stated in Latimer, 'The courts are ill equipped to run the schools.'
 
 
 91
 In the Goss case, the difficulty complained of related to transfer provisions of the school desegregation plan. As there stated, '* * * by the terms of the transfer provisions, a student, upon request, would be permitted, solely on the basis of his own race and the racial composition of the school to which he has been assigned by virtue of rezoning, to transfer from such school, where he would be in a racial minority, back to his former segregated school where his race would be in the majority.' The transfer system there under attack was held to work only to the end that segregation would be perpetuated. Transfers were available only to those who wished to attend schools where their race is in the majority and '* * * there is no provision whereby a student might transfer upon request to a school in which his race is in the minority, unless he qualifies for a 'good cause' transfer.' The court concluded:
 
 
 92
 'We note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or transfer to another. 'This is not to say that appropriate transfer provisions upon the parents' request, consistent with sound school administration and not based upon any state-imposed racial conditions, would fall. * * *'
 
 
 93
 I find none of the defects in the opinion and order of the District Court which are condemned in Goss.
 
 III. DELAY AND EMERGENCY
 
 94
 Considerable emphasis is placed upon the matter of delay from the time the suit was initially filed in the District Court on June 17, 1960, until a final decision was rendered on the merits on May 28, 1963. Briefs of the appellants mention this delay and the majority opinion places emphasis on it. During the course of oral argument, appellants were interrogated by the court as to the delay involved, and the court was assured by counsel that no point was now being made with respect to delay. The matter continues to arise however, in spite of the fact that we do not have the record before us to determine if there was unnecessary delay. There is nothing to show that the parties litigant sought an earlier hearing. We judicially know of the excellent record of the U.S. District Court for the Northern District of Alabama for the expedient dispatch of business. If there has been unnecessary delay in this case, it constitutes the exception rather than the rule. The case of Nelson v. Grooms, 5 Cir. 1962, 307 F.2d 76, may reveal some facts touching the question of delay. In the Nelson case the parties sought a writ of mandamus against U.S. District Judge H. H. Grooms, because he continued the Nelson case pending hearing in the Armstrong case, rather than grant the petitioners' application for preliminary injunction filed on June 13, 1962. The Nelson case was decided by a panel of this court on August 17, 1962. In the Nelson case it was alleged that the Armstrong case (presently before us) had been pending since June 17, 1960, but it was asserted that counsel for Armstrong were W. L. Williams, Jr. of Birmingham and Ernest D. Jackson, Sr. of Jacksonville, Florida; whereas, counsel for Nelson were Constance Baker Motley of New York, and Orzell Billingsley, Jr. and Peter A. Hall of Birmingham. That fact was alleged as a reason why the cases should not be consolidated.[7] The Nelson case is no longer before us, because the plaintiffs have moved from Birmingham and that case has been dismissed. No attack had been made on the action of the court with respect thereto. Presently, in this case, the Armstrong case, Attorneys Williams and Jackson still appear of record as counsel for Armstrong; but in addition, George White of Birmingham and Constance Baker Motley. Jack Greenberg and Leroy D. Clark, all of New York, are also counsel. No criticism is made of the litigants or the lawyers involved as to the arrangements made for handling the cases. Of course, the litigants and the lawyers are free to deal with each other. It is a singular fact however, that at least two of the attorneys who originally filed the Armstrong case remain in it and so far as we know, no complaint was ever made of the delay involved. In Judge Grooms' order it is recited that Judge Lynne would likely hear the Armstrong case in October 1962, and the hearing was held in October 1962.[8] Judge Grooms' order was entered in June 1962, and therefore everyone knew of the proposed hearing date for the Armstrong case as early as June 13, 1962. On the other hand, one of the attorneys who handled the Nelson case where complaint of delay was involved, and mandamus sought, now appears in the Armstrong case. So far as we are able to determine from anything before us, no complaint has ever been made, prior to this time, of the alleged delay in the Armstrong case. Courts are often reluctant to force parties to trial when the litigants on both sides prefer not to proceed to a trial, and many times cases are delayed for the convenience of the parties or for other legitimate reasons. Usually a change in counsel actively handling the case will result in delay. We cannot determine these questions when we have not seen the record.
 
 
 95
 Certainly, there has been no delay in this court. On the 26th day of June 1963, this court considered six (6) cases, all assigned for argument on an emergency basis. Teh six (6) cases are as follows:
 
 
 96
 1. Armstrong et al. v. Board of Education of the City of Birmingham, Jefferson County, Alabama, et al.
 
 
 97
 Decided in District Count on May 28, 1963; notice of appeal filed June 3, 1963; motion for injunction pending appeal filed on June 3, 1963; order assigning the case for oral argument on June 26, 1963, filed on June 5, 1963; and full oral argument was heard on June 26, 1963.
 
 
 98
 2. W. G. Anderson et al. v. City of Albany et al., 5 Cir., 321 F.2d 649.
 
 
 99
 Filed on July 24, 1962; the District Court heard 5 volumes of testimony (over 1300 pages) and entered an order dismissing the case on February 14, 1963; motion for injunction pending appeal, or in the alternative to advance the case on the docket for argument on the merits filed May 31, 1963; on June 5, 1963, an order was filed assigning the case for hearing on the merits on June 26, 1963; and on June 26, 1963, the case was extensively argued on the merits.
 
 
 100
 This case relates to injunctive proceedings against the City of Albany with respect to certain public facilities. One of the chief complaints of the appellants when the suit was initially filed, was the fact that the City of Albany had in effect ordinances requiring segregation of certain of the facilities involved. At the time of argument, all such ordinances had been repealed and there was no compulsory segregation of such facilities. In addition to extensive oral argument on June 26, 1963, another petition seeking an injunction pending appeal was heard before Judge Bell and denied by him on June 13, 1963.
 
 
 101
 3. NAACP v. Thompson, Mayor of the City of Jackson, Mississippi, et al., 5 Cir., 321 F.2d 199.
 
 
 102
 Filed June 7, 1963; hearing conducted and relief denied by U.S. District Court on June 11, 1963; motion for injunction pending appeal filed in this court on June 12, 1963; order entered on June 14, 1963, assigning the case for hearing on the motion for June 26, 1963, at which time full argument was heard.
 
 
 103
 The relief sought is an injunction against the Mayor and city officials of the City of Jackson, Mississippi, restraining and enjoining them from interfering with parades, protests, street demonstrations, and from arresting Negro citizens who refuse to leave private businesses upon being requested to do so.
 
 
 104
 4. In the Matter of Application of Brown v. Rayfield, Chief of Police of City of Jackson, Mississippi (In the Matter of Application of Richards v. Rayfield), 5 Cir., 320 F.2d 96.
 
 
 105
 Petition for writ of habeas corpus filed on June 7, 1963; hearing conducted and writ denied on June 12, 1963, at which time the U.S. District Court refused to certify probable cause; on June 13, 1963, a Judge of this court signed a certificate of probable cause; motion for immediate hearing filed on June 14, 1963; on June 14, 1963, motion granted and case was assigned for immediate hearing on June 26, 1963; and on June 26, 1963, extended oral argument was heard.
 
 
 106
 This writ of habeas corpus sought the release of two Negro citizens who had been arrested in connection with street demonstrations. No effort was made to exhaust state remedies as required by law, because it was alleged that 'members of the various state courts' of the State of Mississippi could not give a fair hearing to the petitioners, and that an effort to obtain state remedies would be futile. The petition also complained that the petitioners were confined in segregated jails in contravention of their constitutional rights. According to affidavit of the Respondent Rayfiled, both petitioner-appellants were released from custody on June 15, 1963, by posting with the Clerk of the Municipal Court of the City of Jackson, Mississippi, an appearance bond in the sum of $100.00 for each of the appellants.
 
 
 107
 5. Kennedy v. Owen, Circuit Court Clerk and Registrar, Jefferson County, Mississippi, et al., 5 Cir., 321 F.2d 116.
 
 
 108
 (7 cases consolidated) Various applications were filed seeking an order of the District Court compelling the production of records by clerks and registrars. Said petitions were filed on various dates, but some were filed in the month of May 1963; District Court held hearing and entered decree granting partial relief and denying some relief sought on June 11, 1963; notice of appeal filed June 18, 1963; motion for summary reversal filed in this court June 20, 1963; order filed June 20, 1963, assigning the cause for oral argument on June 26, 1963; and on June 26, 1963, extended oral argument was heard.
 
 
 109
 By reference to opinion already released, it will be observed that the only question related to the sufficiency of a demand by the Attorney General which was addressed to the parties in their capacity as clerks only; whereas, the parties held the dual position of clerk and registrar.
 
 
 110
 6. United States v. Dallas County, Alabama, et al.
 
 
 111
 Complaint seeking injunction filed in U.S. District Court for the Sourthern District of Alabama at 4:30 P.M. on June 26, 1963; relief denied on June 26, 1963; notice of appeal filed June 26, 1963, and application made to this court for injunction at 9:00 P.M. June 26, 1963, at which time full oral argument was heard.
 
 
 112
 In this proceeding the United States sought to enjoin the Circuit Solicitor of the 4th Judicial Circuit, the County Solicitor of Dallas County, the State Judge having jurisdiction of the case, the Sheriff of Dallas County, Alabama, and Dallas County, Alabama, from prosecuting a 19 year old Negro youth on a charge of resisting arrest and engaging in conduct calculated to cause a breach of the peace. Although the alleged offense was committed on June 17, 1963, and the defendant arrested on that date, no effort was made to enjoin the prosecution until June 26, 1963.
 
 
 113
 It should be noted that in 3 of the cases outlined, relief was sought in the U.S. District Court, action taken by the District Court, the case appealed, and full oral argument heard by this court in 19 days or less. Opposing litigants were required to appeal before our court on unusually short notice, without sufficient time, in some cases, to prepare a brief. Some briefs were hurriedly prepared, typed and filed on the day the case was submitted to this court. Generally, administrative matters of the court, and cases which seek emergency relief, are handled by the court without formal oral argument. In the 6 cases mentioned, full and extended oral argment was permitted.
 
 
 114
 There is another factor which I feel it is my duty to mention as a matter of information to attorneys who appear before our court.[9] The arguments presented in some of the cases mentioned above contained insinuating overtones unfavorably reflecting on both the Federal and State Judiciary, in certain localities, varying in degree from the barely audible tinkling of a distant cymbal to the crashing noise of sounding brass. It is fundamental that lawyers owe full allegiance to their clients and should use their learning, skill, diligence, devotion, and '* * * all appropriate legal means within the law to protect and enforce legitimate interests.'[10] Lawyers are required in the discharge of their duties to disagree with judges, to allege error, to attack the judges' rulings and decisions, and even to render just and proper criticism of such relings, decisions and judgments. But the Office of Judge, whether it be Federal or State, requires the respect of the legal profession to the end that the dignity and independence of the judiciary may be maintained, regardless of the individual who may occupy such office at any given time. It is not appropriate, in my opinion, for lawyers, who are offcers of the courts, to condemn all of the courts of a state, or to reflect improperly upon the courts generally by condemnation of such courts as a class or group. Such arguments are highly improper and are disapproved.[11]
 
 
 115
 At the time the above mentioned 6 cases were being heard, there were pending in this court 260 cases which could be calendared and heard during the summer recess. 117 of such cases could be calendared during July. Further, in addition to the 260 cases which have not been submitted there were, on June 26, 1963, 237 cases which had already been sumitted to the court but not decided. Some of the 237 cases wer argued and submitted over a year ago; 40 were submitted before January 1, 1963, and the blance were submitted since January 1, 1963. These 237 cases are now being considered by the court. All of the cases combined make a total of almost 500 cases pending in this court as of June 26, 1963. Consideration of them will come in the normal course of the court's business, but the 6 cases outlined above received special emergency attention. The workload of this court is currently the heaviest of any Court of Appeals in the nation. The record of this court in hearing and deciding cases is as good as any. That record cannot long endure if certain cases are to be given special attention and considered on a preferential basis. In the vast number of cases now pending before this court are matters of tremendous importance involving business affairs, taxes, property, personal injuries, life and liberty. With deference and full respect, I feel it is my duty to express the opinion that the 6 cases which were fully argued on June 26, 1963, were not of such overwhelming importance as to take precedence over all other cases then pending in this court.
 
 IV. EN BANC HEARING
 
 116
 Because of the importance of this case both as to the motion for injunction pending appeal and the merits of the case on appeal not yet heard, because of the extraordinary relief granted which conditions the merits of the case before an examination of the record by the court, the hurried and emergency action taken by the court, the unique procedure involved, and for other reasons which appear to me sufficient, I hereby request, as authorized by Rule 25a of this court and the applicable statutes,[12] that the court reconsider, rehear and decide this case En Banc, and I hereby initiate consideration of this request by each of the Judges of the Court. See United States v. New York, N.H. & Hartford Railroad Co., 2 Cir. 1960, 276 F.2d 525; Puddu v. Royal Netherlands, etc., 2 Cir. 1962, 303 F.2d 752; Walters v. Moore-McCormack Lines, Inc., 2 Cir. 1963, 312 F.2d 893.
 
 ON PETITION FOR REHEARING BY FULL COURT
 
 117
 PER CURIAM.
 
 
 118
 One of the members of this Court, having in the dissenting opinion, requested a rehearing of the case en banc, the Chief Judge polled the Circuit Judges of this Circuit who are in active service to determine whether an en banc rehearing should be ordered by a majority of such Judges. A majority of the Judges of the Circuit in active service, having voted against convening the Court en banc for the purpose of such rehearing, the petition of the appellees for rehearing by the Court en banc is DENIED.
 
 
 119
 The Petition for Rehearing is Denied.
 
 
 120
 GEWIN, Circuit Judge, dissenting.
 
 
 121
 CAMERON, Circuit Judge (dissenting).
 
 
 122
 On July 12, 1963, a panel of this Court composed of Chief Judge Tuttle and Judges Rives and Gewin filed an opinion and order in this case, ordering the District Court for the Northern District of Alabama to enter the judgment therein set forth, the opinion being written by Judge Rives, a special concurrence by Judge Tuttle, and a dissent by Judge Gewin. Judge Gewin requested that the Court in banc reconsider and decide the case and I joined in that request. The Chief Judge advised that the request had been denied by a five to four vote of the members of the Court. I request had dissent from the action of the members of the Court in refusing this in banc hearing and from the failure of the panel to grant the in banc hearing requested by the appellees in a telegram to each of the Judges of the Court prior to the beginning of the hearing of the case by the panel.
 
 
 123
 Since the filing of the opinion and order on July 12th by the panel of three Judges the appellees have filed with the clerk of this Court a petition for rehearing and reconsideration of the decision and order of the panel. I am advised that a sufficient number of the petitions for rehearing was filed for the distribution, as requested by appellees, of a copy of the petition to each of the Judges of the Court. I am further advised that no copies of the petition for rehearing were submitted to any of the Judges of the Court except the members of the panel which had heard the case. That penal has, with Judge, gewin dissenting, entered an order declining the prayer for an in banc hearing and denying the rehearing; and orders have been entered accordingly. I respectfully dissent from these actions of the panel and the orders entered in connection therewith.
 
 
 124
 The decision of this panel involves questions of procedure which have for some weeks plagued and are still plaguing the Court. The Judges of the Court are sharply divided on these questions and not only the lawyers of the Circuit, but the public generally, are displaying open concern with respect to inconsistent positions which they conceive are being taken by the Court.[1] I feel constrained to present in this dissent the result of some studies I have made and some views I entertain with respect to those questions, eome of which have been so ably and exhaustively discussed by Judge Gewin in his dissenting opinion, in which I fully concur.
 
 
 125
 The procedure followed by the majority here is one which, in any opinion, is not sanctioned by the law. The hearing before these three Judges was not an appeal. Rather, it was what the Third Circuit has termed something 'in the nature of an original proceedings * * *.'[2] It was the substitution of a hearing on 'injunction pending appeal' for a hearing on appeal. Theoretically the appeal is still pending, but it is appearent that there is little or nothing more to hear since the decision and order of the majority of the panel are on the merits of the case, deciding in full, without the benefit of any record of the evidence in the lower court, the questions of law and fact which were before that court in its extended hearing. This phase of the vexatious problem before us has been so well handled by Judge Gewin's dissent that I rest on what he has said, with a few supplementary remarks.
 
 I.
 
 126
 All of these unorthodox procedures have arisen in cases involving racial problems. Attention is focused on several of them in the five opinions written by members of this Court in No. 20240, United States of America v. Ross R. Barnett and Paul B. Johnson, Jr., April 9, 1963, which aggregated a total of one hundred thirty pages; while other angles of the procedural questions were dealt with at some length in United States v. Lynd, 5 Cir., 301 F.2d 818, and the same case decided July 9 and 15, 1963 by a panel composed of Judges Brown, Wisdom and Bell, 321 F.2d 26. The last sentence of Judge Bell's special concurrence in the July 9th hearing characterizes poignantly the dilemma into which this Court has been plundged since it set itself the task of inventing special procedures for the handling of such cases:
 
 
 127
 'This case serves as a classic example of the pitfalls to be encountered, with the attendant disruption and delays in the orderly administration of justice, when courts depart from the time-tested processes of law.
 
 
 128
 The present wave of petitions for treatment according to the new and unusual procedures described in Judge Gewin's dissent, may be said to have been set off by an order granted by Chief Judge Tuttle on May 22, 1963 in No. * * *, Linda Cal Woods by Next Friend v. Theo R. Wright, Superintendent of Schools of the City of Birmingham. The incomplete record of this case on file in this Court states that, on May 21, 1963, this class action was brought against the Superintendent of Schools in the City of Birmingham for an order enjoining him from enforcing a directive of the Board of Education of Birmingham suspending the minor Linda Cal Woods and expelling or suspending approximately 1080 other Negro students from the public schools of Birmingham on the alleged ground that they had been arrested for prading without a permit. The order entered by the Judge of the District Court on May 22nd recites that the case came on for hearing before him on motion for temporary restraining order and/or preliminary injunction and states that the prapyer for both was denied. Reproduced in the margin are excerpts from this order of the District Court.[3]
 
 
 129
 The order signed by Chief Judge Elbert P. Tuttle on the same day recites in part the following:
 
 
 130
 'The appellant * * * has made application to me to grant an injunction * * * pending an appeal on the merits of the case in this Court. Appellant contends that I have jurisdiction as a member of the Court of Appeals for the Fifth Circuit to grant such an injunction pending appeal under the terms of 28 U.S.C.A. 1651(b). * * *
 
 
 131
 'It is clear, therefore, that the Court of Appeals has jurisdiction of this appeal within the contemplation of Section 1651(b). I, therefore, hold that I have jurisdiction and the power to grant the relief here sought. See Aaron v. Cooper, 8 Cir., 261 F.2d 97. See also Rule 62(g), Federal Rules ofCivil Procedure, * * *
 
 
 132
 'Although on the record before me it appears shocking that a Board of Education, interested in the education of the children committed to its care, should thus in effect destory the value of one term of schoolding for so many children at a time when all persons professionally interested in the educational process and the welfare of young people are bending their efforts towards minimizing school dropouts and emphasizing the need for continuing education, the right of the appellant to succeed here cannot be based upon this consideration. If appellant is entitled to an injunction it must be based on my determination that there is a clear right to the relief sought in the trial court and that an irreparable injury will result to appellant and the class which she represents unless the relief by injunction pending appeal is granted.'
 
 
 133
 Judge Tuttle's order contains these directives:
 
 
 134
 'It is ORDERED that Theo R. Wright (and his agents, etc.) * * * are hereby enjoined from continuing to enforce and carry into effect the order of the Board of Education issued by letter on May 20, 1963 * * *
 
 
 135
 'The said appellee (and the others) are further ordered to inform all principals of all schools in the Birmingham school system who received the letter of direction from respondent dated May 20, 1963, * * * that the latter of direction of May 20, 1963, is rescinded and revoked and all students affected thereby are to be permitted to return to their respective classes as regular students immediately. Pending the actual rescission of the said letter, appellee is ordered to make known in any way available to him or to the said students that they are permitted to return to school on Thursday, May 23, 1963.
 
 
 136
 '* * * This order shall stay in effect until the final determination of this appeal on the merits or until the further order of the Court.'
 
 
 137
 The file furnished me by the clerk's office shows that the hearing before Judge Tuttle was had upon an unsworn 'petition' to which was attached what was alleged to be copies of several letters of May 20th, one from the principal of Washington School to Reverend Calvin Woods, father and next friend of the plaintiff, and others from the superintendent of schools to other school officials, all referring to the suspension or expulsion of children from the schools in Birmingham because of their participation in the 'demonstrations' then taking place in the streets of Birmingham. The only proof conforming to the Rules governing granting of temporary injunctions was an affidavit by Reverend Calvin Woods, all of which referred to his daughter Linda and her conduct. As far as I can find there was no refutation at all of the findings of the District Judge concerning the conduct of the hundreds of students besides Linda Cal Woods, the unexcused school absences, the representationst to the District Court by the Board of Education and the other important facts found by the court below as the basis of its denial of the motion for the termporary restraining order. There were no pleadings on behalf of the school board, because there had been no service of process or opportunity to file such pleadings.
 
 
 138
 Nevertheless, Judge Tuttle entered an order finding that there was no genuine dispute as to the fact that the students involved were arrested for participating in a demonstration against policies and practices of segregation either by the municipal government of Birmingham, the school system of Birmingham, or certain businesses in Birmingham whose segregation policies had previously resulted in the arrest of a number of Negro prisoners under either the segregation statutes of the City of Birmingham or the antitrespass laws of the State of Alabama.
 
 
 139
 Even assuming that there was an appeal then pending from the decree of the District Court to this Court, there was, in my opinion, no jurisdiction in the Chief Judge to hear or dispose of the motion for temporary injunction, especially one granting the order he essayed to enter, including, as it does, provisions for mandatory relief effectively disposing of the case on its merits. In the very nature of things, it was inevitable that the School Superintendent would obey the fiat of the Chief Judge of this Court whether it was backed by the authority of the law or not. No action could be taken which would obliterate the harm done to the Birmingham school system by this improvident order.
 
 
 140
 Unfortunately, efforts made by members of the Court to obtain an authoritative ruling on the legality of the order from the Judicial Counsel or the full Court were thwarted by the opposition of The Four.[4]
 
 
 141
 The majority in the instant case-- as has been true in similar decisions rendered in the past few weeks-- placed its reliance chiefly upon case No. 20557, Stell et al. v. Savannah Chatham County Board of Education, et al., 5 Cir., 318 F.2d 425. The injunctive order issued by the majority in the present case is modeled upon the order granted in the Stell case. Judge Gewin, in his dissenting opinion here, shows clearly that the present case is not controlled by the Stell case. In addition, I think that the Stell case should not be followed because it was illegally advanced and set for special hearing by the Chief Judge before a panel selected and assigned by him alone.[5] I am unable to find any authority which is vested in the Chief Judge so to appoint a panel to hear a case or to assign a case for hearing such as was attempted by the Chief Judge in that case.
 
 II.
 
 142
 This Court is, of course, a creature of statute. The statute providing for the assignment of Judges is 28 U.S.C. 46:
 
 
 143
 '46. Assignment of judges; divisions; hearings; quorum
 
 
 144
 '(a) Circuit judges shall sit on the court and its divisions in such order and at such times as the court directs.
 
 
 145
 '(b) In each circuit the court may authorize the hearing and determination of cases and controversies by separate divisions, each consisting of three judges. Such divisions shall sit at the times and places and hear the cases and controversies assigned as the court directs.
 
 
 146
 '(c) Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit.
 
 
 147
 '(d) A majority of the number of judges authorized to constitute a court or division thereof, as provided in paragraph (c), shall constitute a quorum.'
 
 
 148
 The Supreme Court interpreted this statute in the case of Western Pacific Railroad Corporation et al. v. Western Pacific Railroad Company et al., 1953, 345 U.S. 247, 257-258, 73 S.Ct. 656, 661, 97 L.Ed. 986, confirming the language of the statute as having the literal meaning of the words used:
 
 
 149
 'This interpretation makes for an harmonious reading of the whole of 46. In this Section, Congress speaks to the Courts of Appeals: the court, itself, as a body, is authorized to arrange its calendar and distribute its work among its membership; the court, itself, as a body, may designate the places where it will sit. Ordinarily, added Congress, cases are to be heard by divisions of three. But Congress went further; it left no doubt that the court, by a majority vote, could cenvene itself en banc to hear or rehear particular cases.'
 
 
 150
 The Rules of this Court do not, as far as I can find, provide for the assignment of cases for hearing or for the assignment of judges by the Chief Judge or any one Judge.[6] En banc hearings are provided for in Rule 25a of the Rules of this Court. I find no provision for advancement of cases or taking them up out of time either in the statutes or in our Rules or in the Federal Rules of Civil Procedure.[7]
 
 
 151
 From the foregoing, it follows, I think, that the judgment in the instant case should be reversed because the panel which decided it had no legal existence and the order setting it for hearing without a record and giving it other preferential treatment was entered without authority. It follows, moreover, that the judgment should be reversed because the precedents upon which it is grounded were not valid decisions of this Court.
 
 III.
 
 152
 I think, too, that a solution of the problems facing this Court will be helped by a study of the handling of racial cases during the immediate past, in which period so much haste has been made and so many procedural innovations have been utilized that the general impression has grown up and has been expressed that this Court has one set of procedures covering racial cases and another set covering all other cases. I have accoringly made a study of the cases as they appear in the Federal Reporter, Second Series, involving controversies heard before panels of this Court bearing date within the two years preceding the hearing of the present case on June 26, 1963. I believe this survey to be correct. It covers twenty-five cases, which are listed in Appendix 'A' to this opinion. Of the twenty-five cases listed, the majority of the panel in twenty-two of them was composed of some combination of The Four, who constitute a minority of the active Judges. In only two cases did two of the remaining five members of the Court sit together.
 
 
 153
 Of the Circuit Judges of this Circuit, The Four sat fifty-five times; the other five sat twelve times. The Four wrote twenty-three of the twenty-five opinions, including per curiams: Chief Judge Tuttle wrote six, including four per curiams; Judge Rives wrote six, including two per curiams; Judge Brown wrote four, and Judge Wisdom wrote six, including one per curiam. The per curiam order (Appendix 'A', No. 21) adjudging Lieutenant Governor Johnson to be in civil contempt was entered by a panel consisting of Judges Rives, Brown and Wisdom, and one of them wrote the opinion. One per curiam was written by one of the five remaining Judges of this Court and one full opinion was written by a district judge.
 
 IV.
 
 154
 The handling by Chief Judge Tuttle of three judge district courts in the State of Mississippi is a part of the picture of the crusading spirit which I think has been largely responsible for the errors here discussed and is relevant to the discussion of a solution of the problems before us. The statute providing for such courts is in these words:
 
 
 155
 '2284. Three-judge district court; composition; procedure
 
 
 156
 'In any action or proceeding required by Act of Congress to be heard and determined by a district court of three judges the composition and procedure of the court, except as otherwise provided by law, shall be as follows: '(1) The district judge to whom the application for injunction or other relief is presented shall constitute one member of such court. On the filing of the application, he shall immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. Such judges shall serve as members of the court to hear and determine the action or proceeding. * * *'
 
 
 157
 In the performance of the ministerial duty so imposed upon him, the universal practice, except in this Circuit in the last four years, has been for the Chief Judge to appoint the circuit judge resident in the State for which the district court is constituted and one of the district judges resident in such state as the other two members. I have been able to find no instance where this procedure has not been followed except those here mentioned.
 
 
 158
 The State of Mississippi has residing within its borders one Circuit Judge, three active District Judges, and one senior District Judge designated for active service, all of whom have been at all times mentioned citizens of Mississippi, qualified for the positions they hold, and ready, willing nad able to perform the duties incident to service upon such a district court.
 
 
 159
 Since November 9, 1961 and prior to the submission of the instant case, three district courts of three judges have been constituted to hear racial cases in Mississippi.[8]
 
 
 160
 For the first of these District Courts of the United States for the Southern District of Mississippi, Judges Tuttle Rives and Mize were designated; for the second, Judges Rives, Brown and Mize were designated; and for the third, Judges Brown, Wisdom and Cox were designated. A member of The Four was substituted for the resident Circuit Judge in each instnace, and another member of The Four was substituted for the additional District Judge. The idea that the Chief Judge may thus gerrymander the United States Judges of a State in order to accomplish a desired result is, I think, entirely foreign to any just concept of the proper functioning of the judicial process.
 
 V.
 
 161
 If this Court is to regain the stature it owned on March 16, 1959 when Judge Hutcheson laid down the duties of Chief Judge it must, in my opinion, forsake the special procedures which have been discussed and adhere to those which are 'time-tested' and legal. It is important, I think, that 'the court as a body' on whom the responsibility rests take hold of the problem and solve it.
 
 
 162
 I, therefore, respectfully dissent. United States v. New York, New Haven & Hartford Railroad Co., 2 Cir., 1960, 276 F.2d 525; Puddu v. Royal Netherlands, Etc., 2 Cir., 1962, 303 F.2d 752; and Walters v. Moore-McCormick Lines, Inc., 2 Cir., 1963, 312 F.2d 893.
 
 APPENDIX A
 
 163
 1. Dixon v. Alabama State Board of Education, Aug. 4, 1961, 5 Cir., 294 F.2d 150. Expulsion of students for demonstrating. Circuit Judges Rives, Cameron and Wisdom. Opinion by Judge Rives.
 
 
 164
 2. United States v. Wood, Oct. 27, 1961, 5 Cir., 295 F.2d 772. Voter registration. Circuit Judges Rives, Cameron and Brown. Opinion by Judge Rives.
 
 
 165
 3. Meredith v. Fair, Jan. 12, 1962, 5 Cir., 298 F.2d 696. School desegregation. Chief Judge Tuttle, Circuit Judges Rives and Wisdom. Opinion by Judge Wisdom.
 
 
 166
 4. Kennedy v. Bruce, Feb. 5, 1962, 5 Cir., 298 F.2d 860. Voter registration. Chief Judge Tuttle, Circuit Judges Rives and Wisdom. Opinion by Chief Judge Tuttle.
 
 
 167
 5. Stoudenmire v. Braxton, Mar. 9, 1962, 5 Cir., 299 F.2d 846. School desegregation. Chief Judge Tuttle, Circuit Judges Brown and Bell. Per curiam.
 
 
 168
 6. United States v. Lynd, April 10, 1962, 5 Cir., 301 F.2d 818. Voter registration. Chief Judge Tuttle, Circuit Judges Hutcheson and Wisdom. Opinion by Chief Judge Tuttle.
 
 
 169
 7. Christian v. Jemison, April 25, 1962, 5 Cir., 303 F.2d 52. Local transportation desegregation. Circuit Judges Rives, Brown and Wisdom. Opinion by Judge Wisdom.
 
 
 170
 8. State of Alabama v. United States, June 1, 1962, 5 Cir., 304 F.2d 583. Voter registration. Circuit Judges Rives, Cameron and Brown. Opinion by Judge Brown.
 
 
 171
 9. Meredith v. Fair, Feb. 12, 1962, 5 Cir., 305 F.2d 341. School desegregation. Chief Judge Tuttle, Circuit Judges Rives and Wisdom. Per curiam.
 
 
 172
 10. Meredith v. Fair, June 25, 1962, 5 Cir., 305 F.2d 343. School desegregation. Circuit Judges Brown and Wisdom, District Judge DeVane. Opinion by Judge Wisdom.
 
 
 173
 11. Kennedy v. Lynd (and four other consolidated cases), July 11, 1962, 5 Cir., 306 F.2d 222. Voter registration. Circuit Judges Rives, Brown and Wisdom. Opinion by Judge Brown.
 
 
 174
 12. Meredith v. Fair, July 27, 1962, 5 Cir., 306 F.2d 374. School desegregation-- recall of mandate, etc. Circuit Judges Brown and Wisdom, District Judge DeVane. Opinion by Judge Wisdom.
 
 
 175
 13. Guillory v. Administrators of the Tulane University of Louisiana, July 21, 1962, 5 Cir., 306 F.2d 489. School desegregation. Circuit Judges Cameron, Brown and Wisdom. Per curiam.
 
 
 176
 14. Augustus v. Board of Public Instruction, July 24, 1962, 5 Cir., 306 F.2d 862. School desegregation. Chief Judge Tuttle, Circuit Judges Rives and Brown. Opinion by Judge Rives.
 
 
 177
 15. Nelson v. Grooms, Aug. 17, 1962, 5 Cir., 307 F.2d 76. School desegregation-- mandamus. Circuit Judges Rives, Brown and Wisdom. Opinion by Judge Rives.
 
 
 178
 16. Bush v. Orleans Parish School Board, Aug. 6, 1962, 5 Cir., 308 F.2d 491. School desegregation. Circuit Judges Rives, Brown and Wisdom. Opinion by Judge Widsom.
 
 
 179
 17. Stone v. Members of Board of Equcation, City of Atlanta, Ga., Nov. 16, 1962, 5 Cir., 309 F.2d 638. School desegregation. Chief Judge Tuttle, Circuit Judge Brown, District Judge Johnson. Per curiam.
 
 
 180
 18. Hanes v. Shuttlesworth, Nov. 16, 1962, 5 Cir., 310 F.2d 303. Park desegregation. Circuit Judges Rives, Jones and Bell. Per curiam.
 
 
 181
 19. Ross v. Dyer, Dec. 28, 1962, 5 Cir., 312 F.2d 191. School desegregation. Chief Judge Tuttle, Circuit Judges Hutcheson and Brown. Opinion by Judge Brown.
 
 
 182
 20. Potts v. Flax, Feb. 6, 1963, 5 Cir., 313 F.2d 284. School desegregation. Circuit Judges Brown and Bell, District Judge Simpson. Opinion by Judge Brown.
 
 
 183
 21. Meredith v. Fair (United States v. Mississippi and Paul B. Johnson, Jr.), Sept. 29, 1962, 5 Cir., 313 F.2d 534. Civil contempt. Circuit Judges Rives, Brown and Wisdom. Per curiam.
 
 
 184
 22. Clark v. Thompson, March 6, 1963, 5 Cir., 313 F.2d 637. Desegregation of public recreational facilities. Circuit Judges Hutcheson, Gewin and District Judge Hannay. Per curiam.
 
 
 185
 23. United States v. Dogan, Jan. 26, 1963, 5 Cir., 314 F.2d 767. Voter registration. Circuit Judges Rives and Wisdom, District Judge Bootle. Opinion by Judge Bootle.
 
 
 186
 24. City of Shreveport v. United States, 5 Cir., 1963, 316 F.2d 928. Airport desegregation. Chief Judge Tuttle, Circuit Judges Rives and Moore.* Per curiam.
 
 
 187
 25. City of Shreveport v. United States, 5 Cir., 1963, 316 F.2d 928. Bus terminal desegregation. Chief Judge Tuttle, Circuit Judges Rives and Moore.* Per curiam.
 
 ADDENDUM TO APPENDIX A
 
 188
 Since the printing of this dissenting opinion by the Clerk on July 30, 1963, a less hurried examination of the published reports of cases decided during the period specified in the opinion has disclosed that four cases were inadvertently omitted form Appendix 'A'. These were called to the attention of the other Judges of this Court by my letter of August 14, 1963. They are not included in the computations dealt with in Part III of the opinion.
 
 Following are the four omitted cases:
 
 189
 2 1/2. Abernathy v. Patterson, Oct. 31, 1961, 5 Cir., 295 F.2d 452. Enjoining 'segregated' state courts. Circuit Judges Rives and Wisdom, District Judge Carswell. Opinion by Judge Rives.
 
 
 190
 7 1/2. United States ex rel. Seals v. Wiman, May 30, 1962, 5 Cir., 304 F.2d 53. Exclusion of Negroes from state grand and petit juries. Circuit Judges Rives, Brown and Wisdom. Opinion by Judge Rives.
 
 
 191
 21 1/2. Coleman v. Kennedy, Feb. 13, 1963, 5 Cir., 313 F.2d 867. Voter registration. Circuit Judges Rives and Wisdom, District Judge Bootle. Per Curiam.
 
 
 192
 23 1/2. Greene v. Fair, Feb. 18, 1963, 5 Cir., 314 F.2d 200. School desegregation. Chief Judge Tuttle, Circuit Judges Jones and Bell. Per Curiam.
 
 On Petition for Intervention and Stay
 
 193
 Before WISDOM, GEWIN and BELL, Circuit Judges.
 
 
 194
 GEWIN, Circuit Judge.
 
 
 195
 The Petition for Intervention and Stay of the operation of the plan of desegregation approved on August 19, 1963, by the United States District Court for the Northern District of Alabama is hereby denied, Morin v. City of Stuart, 5 Cir., 1939, 112 F.2d 585; Holland v. Board of Public Instruction of Palm Beach County, 5 Cir., 1958, 258 F.2d 730; St. Helena Parish School Board v. Hall, 5 Cir., 1961, 287 F.2d 376; McKenna v. Pan American Petroleum Corp., 5 Cir., 1962, 303 F.2d 778.
 
 
 196
 Under the original opinion and order of the U.S. District Court for the Northern District of Alabama[1] and under the opinion of this Court rendered in this cause on July 12, 1963, Negro children have the constitutional right and the statutory right under the Alabama Pupil Placement Law to make application for transfer and enrollment free of racial discrimination. The issues involved here have long been settled by decisions of the U.S. Supreme Court. Law and order cannot be preserved by yielding to violence and disorder, nor by depriving individuals of constitutional rights decreed to be vested in them by the U.S. Supreme Court. Cooper v. Aaron, 358 U.S. 1, 20, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).
 
 
 197
 We have no trouble in taking judicial notice of the fact that there are many upstanding, splendid, law-abiding citizens in Birmingham and throughout the State of Alabama who are so firmly dedicated to the principle of the orderly process of the courts and the law that they refuse to rebel against those laws which displease them. We also take judicial knowledge of the fact that violence and disorder have erupted in Birmingham. There is no indication that the great body of people of Alabama approve of lawless conduct even though such conduct arises out of the enforcement of laws which change customs and traditions. The question now is not approval or disapproval of the law; but whether the law, order, and the educational process will prevail over violence and disorder. The howling winds of hate and prejudice always make it difficult to hear the voices of the humble, the just, the fair, the wise, the reasonable, and the prudent. We must not permit their voices to be silenced by those who would incite mob violence. 'The best guarantee of civil peace is adherence to, and respect for, the law.' Waston et al. v. City of Memphis et al., 1963, 373 U.S. 526, 83 S.Ct. 1314, 1320, 10 L.Ed.2d 529.
 
 
 198
 'Patience is a great part of justice,'[2] but we are bound by the most recent statement of the U.S. Supreme Court in Goss v. Board of Education of the City of Knoxville, Tennessee (a unanimous opinion) 1963, 373 U.S. 683, 83 S.Ct. 1405, 1409, 10 L.Ed.2d 632, wherein the Court stated:
 
 
 199
 'In reaching this result we are not unmindful of the deep-rooted problems involved. Indeed, it was consideration for the multifarious local difficulties and 'variety of obstacles' which might arise in this transition that led this Court eight years ago to frame its mandate in Brown in such language as 'good faith compliance at the earliest practicable date' and 'all deliberate speed.' Brown v. Board of Education, 349 U.S., (294) at 300, 301 (75 S.Ct. 753, 99 L.Ed. 1083). Now, however, eight years after this decree was rendered and over nine years after the first Brown decision, the context in which we must interpret and apply this language to plans for desegregation has been significantly altered.'
 
 
 200
 The writer of this opinion wishes to state that it has been and is now his feeling that the opinion of the U.S. District Court for the Northern District of Alabama as originally entered in this cause should have been affirmed for the foloowing reasons:
 
 
 201
 1. The same was in full compliance with the decisions of the U.S. Supreme Court and of this Court.
 
 
 202
 2. The District Judge being a resident of the area involved is better qualified to consider and deal with '* * * the multifarious local difficulties and 'variety of obstacles' which might arise in this transition.'[3]
 
 
 203
 Under the opinion of the District Court for the Northern District of Alabama originally entered in this case; the opinion of the majority and the dissenting opinion released on July 12, 1963 by this Court; the opinion in Shuttlesworth v. Birmingham Board of Education, N.D.Ala.1958, 162 F.Supp. 372; the Supreme Court cases herein cited; and numerous other decisions of the U.S. Supreme Court and the various Circuit Courts of Appeal, the rights of the plaintiffs and those similarly situated to attend the schools which have been designated for their attendance is clear and unequivocal. Court orders, like constitutional rights, cannot yield to violence. In the present status of this case the Board of Education of the City of Birmingham, the present members of the Board and Theo R. Wright, Superintendent of Schools, their successors, etc. must comply with the plan of desegregation approved by the U.S. District Court for the Northern District of Alabama on August 19, 1963, in this cause.
 
 
 204
 A solution may be found in the following pronouncement by Mr. Justice Frankfurter in his concurring opinion in Cooper v. Aaron, supra:
 
 
 205
 'By working together, by sharing in a common effort, men of different minds and tempers, even if they do not reach agreement, acquire understanding and thereby tolerance of their differences.'
 
 
 
 [1]
 'The appellees urge also that the judgment should be affirmed because the plaintiffs have not exhausted their administrative remedies under the Florida Pupil Assignment Law of 1956, Chapter 31380, Laws of Florida, Second Extraordinary Session 1956, F.S.A. 230.231 (230.232). Neither that nor any other law can justify a violation of the Constitution of the United States by the requirement of racial segregation in the public schools. So long as that requirement continues throughout the public school system of Dade County, it would be premature to consider the effect of the Florida laws as to the assignment of pupils to particular schools.' Gibson v. Board of Public Instruction of Dade County, 5 Cir. 1957, 246 F.2d 913, 914-915
 
 
 [2]
 'On the first appeal in this case, we said that so long as the requirement of racial segregation continues throughout the public school system it is premature to consider the effect of the law providing for the assignment of pupils to particular schools. See 246 F.2d at pages 914, 915. Obviously, unless some legally nonsegregated schools are provided, there can be no constitutional assignment of a pupil to a particular school. We do not understand that the Fourth Circuit has ruled to the contrary[5]The net effect of its rulings, as we understand them, is that the desegregation of the public schools may occur simultaneously with and be accomplished by the good faith application of the law providing for the assignment of pupils to particular schools. If that understanding is correct, then we readily agree.
 '5. See Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724; Covington v. Edwards, 4 Cir., 1959, 264 F.2d 780; Holt v. Raleigh City Board of Education, 4 Cir., 1959, 265 F.2d 95; Allen v. County School Board of Prince Edward County, Va., 4 Cir., 1959, 266 F.2d 507.'
 Gibson v. Board of Public Instruction, Dade County, Fla., 5 Cir. 1959, 272 F.2d 763, 767.
 
 
 [3]
 'A three-judge district court recently held that the Alabama School Placement Law is not unconstitutional on its face, but concluded that ruling with a clear note of warning:
 "All that has been said in this present opinion must be limited to the constitutionality of the law upon its face. The School Placement law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the State.'
 Nothing said in that opinion conflicts in any way with this Court's earlier statement relative to the Florida Pupil Assignment Law:
 "* * * Neither that nor any other law can justify a violation of the Constitution of the United States by the requirement of racial segregation in the public schools.' Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913, 914.'
 Holland v. Board of Public Instruction, 5 Cir. 1958, 258 F.2d 730, 732.
 
 
 [4]
 'This Court, like both Judge Wright and Judge Ellis, condemns the Pupil Placement Act when, with a fanfare of trumpets, it is hailed as the instrument for carrying out a desegregation plan while all the time the entire public knows that in fact it is being used to maintain segregation by allowing a little token desegregation. When the Act is appropriately applied, to individuals as individuals, regardless of race, it has no necessary relation to desegregation at all.' Bush v. Orleans Parish School Board, 5 Cir. 1962, 308 F.2d 491, 499
 
 
 [5]
 The district court cited: Covington v. Edwards, 4 Cir. 1959, 264 F.2d 780; Holt v. Raleigh City Board of Education, 4 Cir. 1959, 265 F.2d 95; McCoy v. Greensboro City Board of Education, 4 Cir. 1960, 283 F.2d 667; Jeffers v. Whitley, 4 Cir. 1962, 309 F.2d 621; Wheeler v. Durham City Board of Education, 4 Cir. 1962, 300 F.2d 630
 
 
 [6]
 As the district court recognized in its opinion, the present action also proceeds under 42 U.S.C.A. 1983
 
 
 [7]
 Superintendent of Schools of the City of Birmingham, Theo R. Wright, testified by affidavit upon the present motion at some length, concluding: '* * * the attempted desegregation of any one grade in the system at the commencement of the fall term this year would be greatly disruptive of the whole school system, and extremely impracticable and injurious, if not impossible, for the reasons stated herein and in other affidavits of affiant.' There was no controverting testimony
 
 
 [1]
 See Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753
 
 
 [2]
 The Shuttlesworth case was decided by a three Judge District Court and not by this court. The Shuttlesworth case was affirmed by the Supreme Court
 
 
 [3]
 Cumberland Tel. & Tel. Co. v. La. Pub. Serv. Comm., 260 U.S. 212, 43 S.Ct. 75, 77, 67 L.Ed. 217, is a case in which the Supreme Court recognized the fact that the trial court should first be asked for such injunctive relief:
 'We, of course, appreciate that, notwithstanding a denial of an injunction on its merits, a court may properly find that pending a final determination of the suit on the merits in a court of last resort, a balance of convenience may be best secured by maintaining the status quo and securing an equitable adjustment of the finally adjudicated rights of all concerned, though the conditions of a bond. Hovey v. McDonald, 109 U.S. 150, 161 (3 S.Ct. 136, 27 L.Ed. 888, 891); Equity Rule No. 74. But the court which is best and most conveniently able to exercise the nice discretion needed to determine this balance of convenience is the one which has considered the case on its merits and, therefore, is familiar with the record.'
 See also Peay et al. v. Cox, 5 Cir. 1951, 190 F.2d 123, wherein the court was dealing with the question of injunctions and the exhaustion of administrative remedies and there held that an injunction should not issue. The Court concluded that state remedies which are administrative as distinguished from those which are judicial should first be exhausted, because the exhaustion of administrative remedies does not result in the matter becoming res judicata; citing with approval Bates, et al. v. Batte, et al., 5 Cir. 1951, 187 F.2d 142; Cook v. Davis, 5 Cir. 1949, 178 F.2d 595; Shinholt, et al. v. Angle, 5 Cir. 1937, 90 F.2d 297.
 
 
 [4]
 See also Cumberland Tel. & Tel. Co. v. Louisiana Pub. Serv. Comm., 260 U.S. 212, 43 S.Ct. 75, 67 L.Ed. 217; and In re Philadelphia & Reading Coal & Iron Co., 103 F.2d 901, 903 (3 Cir. 1939); and Greene v. Fair, 314 F.2d 200 (5 Cir. 1963)
 
 
 [5]
 In the first Gibson case, for example, there was a rule of the school board directed to the superintendent, principals, and all other personnel, advising them that the public school system of Dade County, Florida, 'will continue to be operated, maintained and conducted on a nonintegrated basis.' In the second Gibson appeal, Judge Rives states that the racial factor was imminent in the consideration of the assignment and transfer of pupils under the plan there being considered. For example, the application contained a blank space after the word 'school', and did not permit a '* * * conscious preference for continued segregation on a voluntary basis.' It was also stated that certain forms and school records continued to emphasize 'White' and 'Negro'; and it was finally held that for all practical purposes '* * * the requirement of racial segregation in the public schools continued at the time of trial.'
 In Holland, Judge Rives reaffirmed that the Alabama School Placement Law is approved; but as to the Florida Pupil Assignment Law, cited the first Gibson case as to '* * * the requirement of racial segregation in the pupil schools * * *'. See majority opinion.
 The Mannings case related to a procedural question. There the court dismissed the complaint without affording the plaintiffs an opportunity of making proof of their allegations. Accordingly, whatever the complaint alleged was considered true under the procedure, and the complaint alleged compulsory racial segregation.
 In Augustus, the Florida Pupil Assignment Law was still under attack and each year the Board passed a resolution assigning each pupil back to the school which he had previously attended. The district court in Augustus found that the racial factor was a consideration in the assignment of students and that the Placement Law was being used for that purpose.
 In Bush, two district Judges and the Court of Appeals found that the Placement Law there involved was '* * * being used to maintain segregation * * *,' and there was no approval of the Placement Law there involved such as the approval given the Alabama Placement Law in Shuttlesworth.
 
 
 [6]
 It was pointed out in the opinion that before the question of segregation in a school on account of race could be presented to the Superintendent of Public Instruction, 50 residents of a school district, or 10% Whichever is lesser, were required to file a complaint. Any final decision by the Superintendent was subject to review by the courts. The Superintendent himself apparently had no power to order corrective action. His only function was to investigate, recommend and report. He could give no remedy. He could make no controlling finding of fact or law, and his recommendations were not required to be followed by any court or executive order. Numerous other deficiencies in the Illinois law are made clear by the opinion
 
 
 [7]
 We quote from the petition for mandamus in the Nelson case filed by the same counsel who orally argued the Armstrong case before this court:
 'Counsel for the plaintiffs in the Armstrong case are not the same as counsel for the petitioner here. Counsel for the plaintiffs in the Armstrong case are: W. L. Williams, Jr., 1630 Fourth Avenue, North, Birmingham, Alabama, and Ernest D. Jackson, Sr., 410 Board Street, Jacksonville, Florida.'
 
 
 [8]
 The hearing before Judge Lynne was concluded the latter part of October, and the parties were given time to file briefs. In addition, the record of the testimony had to be transcribed
 
 
 [9]
 See Canons of Judicial Ethics, American Bar Association, Cannon No. 11; Handbook for Judges (Carroll, Ed. 1961) American Judicature Society, p. 7
 
 
 [10]
 See Code of Trial Conduct. American College of Trial Lawyers, 1962-63
 
 
 [11]
 See Canons of Professional Ethics, American Bar Association, Canon No. 1
 
 
 [12]
 28 U.S.C.A. 46. 'Assignment of judges; divisions; hearings; quorum
 '(c) Cases and controversies shall be heard and determined by a court of division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in active service. A court in banc shall consist of all active circuit judges of the circuit.'
 
 
 [1]
 A feature article dated at New Orleans and appearing in the public press of July 20, 1963, presents a widely held conception of the situation. Excerpts from that article follow:
 'The U.S. Circuit Court for the Firth Circuit has blazed new legal trails for nearly a decade in the deep south in the civil rights struggle for which Negroes are now demonstrating. * * *
 'The Court's 'hard core' majority has moved at every opportunity, within its appellate power, to implement this school decision. Its orders, some without precedent, forced the riot-triggering admission of James Meredith to the University of Mississippi last year.
 'It often has moved ahead of the Supreme Court to use the 1954 decision as a guideline to order desegregation of other facilities-- buses, terminals, libraries, city auditoriums, parks and playgrounds. * * *
 'It has repeatedly overruled, and often sharply rebuked, Southern district court judges who have refused to accept or carry out the Supreme Court's rulings. * * *
 'The split was exemplified by the Court's recent 4-4 deadlock over the issue of a jury trial for Mississippi Governor Ross Barnett on criminal contempt charges growing out of his defiance of its orders to integrate Ole Miss. * * *
 'The four judges who opposed a jury trial for Barnett have stood together consistently in decisions on civil rights cases. They are Chief Judge Tuttle and Judges Richard T. Rives of Montgomery, Alabama, John Minor Wisdom of New Orleans, and John R. Brown of Houston. * * *'
 These four Judges will hereafter sometimes be referred to as The Four.
 
 
 [2]
 Two Guys from Harrison-Allentown, Inc. v. McGinley, 1959, 266 F.2d 427, 431-432, Note 6
 
 
 [3]
 After reciting its finding that those attending the public schools of Birmingham had been cautioned not to stay away from school during the remaining weeks of the session, the order continues:
 'This Court was shocked to see hundreds of school children ranging in age from six to sixteen running loose and wild without direction over the streets of Birmingham and in the business establishments. It is due to the patience and good judgment of the people of Birmingham and the police officials particularly that no one was seriously injured on May 7, 1963, when the demonstrators were allowed by the police department and city officials of Birmingham to parade within a certain designated area, and the hundreds of school children in the parade refused to stay within the boundaries of the parade area, broke through the police and for some forty-five minutes ran wild over the City of Birmingham.
 'This Court cannot conceive of a Federal Court saying to the Board of Education of the City of Birmingham, made up of dedicated, courageous, honorable men that they should take no action under the circumstances and that the children who deliberately failed to attend school for some several days should not in any way be punished or penalized. White students in recent weeks have been suspended or expelled from the Birmingham high schools for similar or lesser offenses. * * * This Court feels that the Board of Education of the City of Birmingham in its disciplinary problems deserves no interference from this Court so long as it stays within reasonable bounds. The Court has been assured by the Board of Education that proper officials are presently in the process of giving each and every student who has been notified that he has been suspended or expelled, a speedy, fair and comprehensive hearing, that the students have been notified of the specific charges brought against them which, if proven, would justify discipline or expulsion under the regulations or policy of the Board of Education.
 'This Court has been advised that the suspension or expulsion of no child will be upheld by the school Board, after a hearing, due to prejudice, anger or in retaliation.
 'The Court feels that this is borne our by the fact that the school Board in adopting its policy at the same time stipulated that all students, whether expelled or suspended, would be allowed to make up the work that they had lost in summer school. * * * Furthermore, the Court finds that suspension, pending a hearing and opportunity to make up the work in the summer in any event is not unduly harsh under the circumstances, taking into consideration the necessity of maintaining the morale and efficient operation of the school system.
 'It is, therefore, at this time, ORDERED, ADJUDGED and DECREED that plaintiff's motion for a temporary restraining order be, and the same is hereby denied." [Emphasis added.]
 
 
 [4]
 The entry made on the Minutes of the meeting of the Judicial Council for the Fifth Circuit in New Orleans on May 29, 1963 follows:
 'The power of a single Circuit Judge to act in certain instances including the power to grant injunctive relief was next discussed. It was not possible to resolve the question of power by rule or otherwise due to an even division among the members of the Council as to the presence or absence of such power, and because some felt that it was not the appropriate subject matter of a rule.'
 
 
 [5]
 The order, as it appears in the file of the Stell case, is as follows:
 'It is ORDERED that the above entitled and numbered cause be assigned for hearing at Atlanta, Georgia on Friday, May 24, 1963 before a panel consisting of Judges Tuttle, Rives and Bell.
 Elbert P. Tuttle CHIEF JUDGE, U.S. Court of Appeals.
 to be filed and entered as of 5/21.'
 The panel before whom cases were being argued during the week beginning May 20th was the one sitting at Houston, Texas composed of Judges Hutcheson, Brown and Lumbard.
 
 
 [6]
 The only rules I can find relating to the assignment of cases and of Judges are Rules 35, 36 and 17:
 'Rule 35. Assignment of Cases for Hearing
 '1. Thirty days prior to the opening of a regular session of this court at Atlanta, Montgomery, Fort Worth, and Jacksonville, and thirty days prior to the opening of the various sessions at New Orleans, the clerk is directed to assign cases returnable at said places that are ready for hearing in such manner as may be most convenient to expedite the business of the court.
 '2. Any appeal returnable at Atlanta, Montgomery, Fort Worth, Jacksonville, or New Orleans may be assigned for hearing at any other place of holding court for a more prompt hearing, on consent of the parties or on motion of either party or on the court's own motion.'
 'Rule 36. Assignment of Judges
 'It is ordered that whenever a full bench of three judges shall not be made up by the attendance of the associate justice of the Supreme Court assigned to the circuit, and of the circuit judges, so many of the district judges, as may be necessary to make up a full court of three judges, are hereby designated and assigned to sit in this court; provided, however, that the court may, at any time, by particular assignment, designate any district judge to sit as aforesaid.'
 'Rule 17. Docket
 'The clerk shall enter upon a docket all cases brought to and pending in the court in their proper chronological order, and such docket shall be called at every term * * *.'
 
 
 [7]
 Rule 40, F.R.C.P. provides that precedence shall be given to actions entitled thereto by any statute of the United States
 
 
 [8]
 No. 3215, Jackson Division, Southern District, United States v. City of McComb, et al., order entered 11-9-61; No. C-3235, Jackson Division, Southern District, Reverend Clark et al. v. Allen Thompson, Mayor, et al., order entered 1-23-62; No. C-3312, Jackson Division, Southern District, United States v. State of Mississippi et al., order entered 9-5-62
 
 
 *
 Of the Second Circuit, sitting by designation
 
 
 [1]
 In Judge Lynne's original opinion it was stated:
 'This Court will not sanction discrimination by them (the Superintendent and Board of Education) in the name of the Placement Law * * *'
 'Adequate time remains before the opening of the September, 1963, school term for the processing of applications for assignments or transfers in behalf of interested individuals. Jurisdiction of this action will be retained for the purpose of permitting the filing of such supplemental complaint, if any, as might be entitled to be presented, in case of any unconstitutional application of the Alabama School Placement Law against the plaintiffs, or others similarly situated, or of any other unconstitutional action on the part of defendants against them. The issues tendered by any supplemental complaint will be given a preferred setting on the docket of this court and will be heard on five days notice to defendants.'
 
 
 [2]
 'Handbook for Judges' edited by Donald K. Carroll, American Judicature Society
 
 
 [3]
 See Goss v. Board of Education of the City of Knoxville, Tennessee, supra